IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NEAL EUGENE McDONALD,                    *

    Plaintiff,                              *

v.                                        *         Civil Action No. GLR-19-3380

FRANK B. BISHOP, Warden, et al.,         *

    Defendants.                             *
                                       ***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Holly Pierce's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 15), and Defendant Frank B. Bishop's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 17).[1] The Motions are ripe for review, and no hearing is needed. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant in part and deny in part the Motions, which the Court construes as motions for summary judgment.

## I.    BACKGROUND

### A.    McDonald's Allegations

Plaintiff Neal Eugene McDonald is an inmate housed at the North Branch Correctional Institution in Cumberland, Maryland ("NBCI"). (Compl. at 1, ECF No. 1).[2]

---

[1] Also pending before the Court are Plaintiff Neal Eugene McDonald's Motion to Appoint Counsel (ECF No. 23) and Motion to Submit Affidavit and Medical Record (ECF No. 25). Because the Court will permit some of McDonald's claims to move forward and discovery will soon commence, these Motions will be granted.

[2] Citations to page numbers in the Complaint refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

McDonald brings this action against NBCI Warden Frank B. Bishop, who is employed by the Maryland Department of Public Safety and Correctional Services ("DPSCS"), and Holly Pierce, a nurse practitioner who is assigned to NBCI and employed by Corizon, Inc., and Wexford Health Services.[3] (Id. at 2, 4, 5).

McDonald claims generally that Defendants have violated his medical and religious rights by refusing to replace his medical allergen diet, which avoids peanuts and eggs, with a religious kosher diet. (Id. at 4, 7). McDonald claims that he does not have life-threatening food allergies and the medical allergen diet is not necessary. (Id. at 8). McDonald also asserts that while it is documented that peanuts and eggs cause him to have excessive bowel movements, there is no documentation in his medical records showing that he is allergic to these food items. (See Compl. Exs. at 12, 15, 31, ECF No. 1-1).

In support of these allegations, McDonald submits a copy of an email thread dated September 7, 2016, which shows that McDonald was permitted to switch from the medical allergen diet to the religious diet while he was housed at the Western Correctional Institution ("WCI").[4] (Id. at 15). In the email, Galen Beitzel, Administrative Chaplain at WCI, states that he was with McDonald when he opted out of the medical allergen diet. (Id.). The note indicates that Beitzel "made sure [McDonald] understood that peanut butter and eggs were served on the Religious Diet" and that "he could die if he was allergic to

---

[3] Throughout the Complaint, McDonald refers to Defendant Pierce as "N.P. Holly." (See Compl. at 5). The Court refers to this Defendant as "Pierce" or "Defendant Pierce."

[4] See Fed.R.Civ.P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

peanut butter and/or eggs," to which McDonald responded that "he was only on [the medical allergen diet] to avoid a lot of bowel movements." (Id.).

McDonald also states that on August 31, 2018, he signed a DPSCS Release of Responsibility ("ROR") form in order to be removed from the medical allergen diet. (Compl. at 5–6; Compl. Exs. at 13, 14). By signing the ROR, McDonald acknowledged that he had "been counseled by the medical and/or dietary staff that diet plays a critical role in the management [and] prevention of [his] disease" and that he "understand[s] fully the potential adverse impact of a regular diet on [his] disease." (Compl. Exs. at 14). The ROR further states that McDonald "hereby exercise[s] [his] right to refuse [his] medical diet and understand[s] that a regular diet will be substituted." (Id.).

McDonald alleges that Certified Registered Nurse Practitioner ("CRNP") Katrina Opel approved the ROR on September 11, 2018, but Defendant Pierce later stated she did not feel comfortable signing off on the forms. (Compl. at 6). The exhibits to McDonald's Complaint, however, include a note from CRNP Opel dated September 11, 2018, regarding McDonald's medical diet. (Compl. Exs. at 12). The note states that "McDonald has filed ARPs in the past for getting eggs on his tray," McDonald gets "hives and facial swelling from eggs," and McDonald was advised he cannot discontinue the medical diet because eating eggs "can lead to possible anaphylaxis" and "put[s] him at medical risk." (Id.). In a handwritten note on this exhibit, McDonald explains that Opel's note "points to a conspiracy between medical and dietary" to prevent him from discontinuing the medical allergen diet. (Id.).

3

McDonald also submits several Administrative Remedy Procedure ("ARP") requests in support of his claims. (See Compl. Exs. at 22–45). In an ARP appeal dated October 23, 2018, McDonald states that he is an Ethiopian Jew and the kosher religious diet is a form of worship. (Id. at 38). Additionally, in an ARP dated February 11, 2019, McDonald states he was "approved for kosher diet by Rabbi Tobesman in 2018." (Id. at 28).

McDonald alleges that on May 9, 2019, in the presence of Defendant Pierce and NBCI Correctional Officer Sowers, McDonald ate peanut butter to demonstrate he was not allergic. (Compl. at 6). As proof, McDonald submits a signed declaration from Officer Sowers dated May 13, 2019. (Compl. Exs. at 1–2). The declaration states that on May 9, 2019, Sowers witnessed McDonald "eat a scoop" of peanut butter in the presence of Pierce, who told McDonald that she would contact Opel if "no one calls [Pierce] for an epi pen in an hour." (Id. at 1). Sowers states he is not aware of any calls made to medical on May 9, 2019 requesting an epinephrine injection for McDonald, and on May 12, 2019, he spoke to McDonald, who was "alive and well." (Id. at 2).

In an ARP dated May 10, 2019, McDonald documented the May 9, 2019 encounter with Pierce and complained that his medical file incorrectly reflected that he has life-threatening food allergies. (Id. at 26). McDonald requested that his medical records be corrected and that the referral be forwarded to the Dietary Department so that he could receive a regular diet. (Id. at 25–26). On June 10, 2019, Defendant Bishop dismissed McDonald's ARP, stating:

4

> An investigation revealed that you reported a food allergy to medical in August 2016, with documentation completed that you have an anaphylaxis reaction [to] peanut oil and eggs. You were evaluated by a provider on 5/9/19, where you expressed your disagreement with your documented allergy. At that time, no changes were made to your diet or allergies. You will continue to be monitored through the sick call process. Your administrative remedy allegations are without merit.

(Id. at 25). After Bishop denied McDonald's ARP, McDonald was forced to continue on the medical allergen diet. (Compl. at 7–8).

**B.    Medical Records**

On March 25, 2016, McDonald submitted a sick call request stating that he had been issued a high calorie diet on December 21, 2014, but is allergic to peanuts, eggs, peppers, and fish. (Medical Records ["Med. R."] at 2, ECF No. 15-4). Nurse Noonan conducted a physical examination on March 28, 2016, during which McDonald reported the same allergies. (Id. at 3). Noonan noted that these allergies had not been previously recorded in the allergy section of McDonald's electronic patient health record. (Id.). McDonald was advised to avoid allergens until he could be seen by a provider to assess his allergies and the need for a high caloric diet. (Id.).

On April 8, 2016, McDonald was seen on sick call to discuss his allergies. (Id. at 6). Noonan advised McDonald to obtain his medical records from prior to his incarceration to expedite the process of assessing his allergies. (Id.). On August 18, 2016, McDonald was seen by Nurse Sue Brant to document his allergies to peanuts and eggs. (Id. at 10). During this visit, McDonald stated that "his throat swells from peanuts and eggs." (Id.). The same day, a medical diet referral form was completed by the health care provider to note

McDonald had an allergy to peanuts and eggs and that consumption "causes tongue and throat edema." (Id. at 9). On September 6, 2016, however, a health care provider completed a medical diet referral form noting that McDonald wanted the "kosher diet only." (Id. at 12).

On February 21, 2017, McDonald completed a sick call request for replacement eyeglasses. (Id. at 13). On the sick call slip, McDonald indicated he was allergic to eggs and peanut oil. (Id.). On February 23, 2017, a health care provider completed a medical diet referral form for McDonald noting an egg and peanut allergy. (Id. at 14).

On July 3, 2017, McDonald submitted a sick call slip asking to be seen by a medical provider to "sign-off on food allergies of peanut butter." (Id. at 15). McDonald subsequently met with Nurse Krista Self on July 17, 2017. (Id. at 16). During this visit, McDonald requested to "sign off the p-nut allergy diet." (Id.). McDonald explained that he develops diarrhea after eating peanut butter and "most of the time" he was provided with meal trays containing peanut butter, which "causes more of an issue" and at times prevents him from eating. (Id.). The medical records also state that McDonald "need[ed] to continue to with egg allergy as it causes hives and facial swelling." (Id.). Nurse Self noted that "[p]aperwork was completed and faxed to dietary." (Id.). It does not appear, however, that the peanut allergy was discontinued from McDonald's chart at that time. (Decl. of Holly Pierce, CRNP ["Pierce Decl."] ¶ 12, ECF No. 15-3).

On September 14, 2017, McDonald submitted an ARP indicating that he received a scoop of peanut butter in his breakfast tray even though he is allergic to peanut butter. (Med. R. at 18). McDonald's complaint further stated that he was "allergic to eggs and

6

peanut butter" and he went through the medical process to receive paperwork and an identification card noting his allergies. (Id.). McDonald stated that giving him peanut butter was "intentionally being done" and that "[s]omeone is trying to kill" him because "a food that can kill [him]" was "placed on [his] tray for consumption" even though his tray was clearly labeled "NO EGG-NUT." (Id.). McDonald's ARP was dismissed without merit on September 26, 2017. (Id. at 19–20). The investigator found that "McDonald did accidentally receive a breakfast tray with peanut butter" and was offered another tray without peanut butter but "McDonald refused the tray." (Id. at 20).

On February 14, 2018, McDonald was seen by Dr. Mahboob Ashraf for chronic care. (Id. at 22). The report from this visit listed McDonald's allergies as peanut oil and eggs and noted, "Per NP patient states his throat swells from peanuts and eggs"; however, it does not appear that McDonald's allergies were specifically discussed at this visit. (Id.). The records from this visit reflected that McDonald was on a cardiovascular diet, which was renewed. (Id. at 22; Pierce Decl. ¶ 14).

McDonald submitted ARPs on May 10, 2018, June 2, 2018 and July 12, 2018, to complain of receiving meals with products made from eggs, including mayonnaise and cookies, despite his allergy to eggs. (Med. R. at 25, 27, 28). On August 28, 2018, however, McDonald submitted a sick call slip "requesting to sign a ROR [Release of Responsibility] on [his] food allergies and be removed from the No Nut/No Egg diet list." (Id. at 29). The health care provider noted on the sick call request: "Signed off 7-18-17 peanut/egg because Koshi [sic] diet breathing problems." (Id.). On August 31, 2018, McDonald signed the

ROR and medical diet refusal acknowledgement form and was referred to the physician to remove his dietary restrictions. (Id. at 30–32; Pierce Decl. ¶ 18).

On September 11, 2018, McDonald was seen in chronic care by Dr. Asresahegn Getachew and Nurse Opel. (Med. R. at 33). McDonald complained about his current diet during the visit, stating that "he does not have a true allergy to peanuts and eggs," "he only gets diarrhea when he eats the food," and he does not experience "hives or difficulty breathing when consuming the food." (Id.). McDonald once again requested to opt out of the medical allergen diet and was advised to seek immediate medical assistance if he developed hives or an anaphylaxis reaction. (Id.).

An addendum was added to the medical record by Nurse Opel on September 14, 2018. (Id. at 36). The addendum states:

> After turning in the paperwork to dietary, dietary called and stated that Mr. McDonald has filed ARP[s] in the past for getting eggs on his [meal] tray and they wanted to make sure that we in fact wanted to sign off on the allergy. Per Medical provider not[e] 7/7/17 Patient signed off on allergy diet. However, the note also states that the patient has hives and facial swelling from eggs. Patient did not state the truth about egg allergy because he stated to this provider that it only caused diarrhea. Patient was advised that he can not [sic] sign off of the diet since it causes hives and can lead to possible anaphaylaxsis [sic]. Patient was very aggitated [sic] and stated that "it is his medical right to refuse." Patient was made aware that he is able to sign off of medical diets but he can not [sic] sign off of allergies because it can put him [at] medical at risk. Patient is not happy about the decision to keep his allergies active.

(Id.).

McDonald was seen for a chronic care visit with Defendant Pierce on February 11, 2019. (Id. at 37–39). The report from the visit again listed allergies to peanut oil and egg,

8

noting "[p]er RN patient states his throat swells from peanuts and eggs." (Id. at 37). On February 14, 2019, Defendant Pierce renewed McDonald's medical allergen diet. (Id. at 40).

On February 19, 2019, McDonald was seen for an urgent medical visit with Defendant Pierce due to complaints of chest pain. (Id. at 41–42). McDonald was transported to the emergency room at a nearby hospital. (Id. at 41, 43–49; Pierce Decl. ¶ 21). The hospital record noted that McDonald had peanut oil and egg allergies of "unknown" severity. (Med. R. at 43). According to Defendant Pierce, "[t]he hospital does not have access to the patient's medical records from the prison, so the listing of the egg and peanut allergies was due to [McDonald] reporting them at the ER." (Pierce Decl. ¶ 21).

On February 21, 2019, McDonald submitted a sick call request stating he was "approved to be removed from allergy diet by [Defendant Pierce] and Opel CRNP" and asking to "please have referral sent to dietary." (Med. R. at 50). Pierce avers, however, that McDonald had not been approved for the diet because he had previously reported that eggs and peanuts caused an anaphylactic reaction. (Pierce Decl. ¶ 22). Pierce asserts that "[t]he patient's statements in the sick call request are false, as he previously reported to his providers that eggs and peanuts cause his throat and tongue to swell." (Id.).

On February 23, 2019, McDonald submitted another sick call request stating that he was still assigned to the allergy diet even though Pierce had approved him to be removed from the diet. (Med. R. at 51). McDonald stated, "I am not allergic to eggs/peanuts nor does it cause swelling of the throat nor have I ever stated that it does cause swelling of the throat." (Id.). McDonald saw Dr. Getachew on sick call later that day. (Id. at 52). During

the visit, McDonald once again requested a regular diet. (Id.). The record from this visit notes that McDonald had recently seen a nurse practitioner regarding this request, and that diet papers had been signed and a regular diet was ordered. (Id.). The same day, a health provider completed a medical diet referral form changing McDonald's diet to a "regular diet." (Id. at 54–55).

On May 9, 2019, McDonald was seen on sick call by Dr. Desha Bedford for complaints of chest pain. (Id. at 56–57). During this visit, McDonald indicated he was on a "hunger strike" and requested a kosher diet. (Id. at 56). Later that day, Pierce evaluated McDonald regarding his complaints of chest pain and his refusal to eat. (Id. at 58). McDonald explained he had not eaten because he was "upset about his peanut and egg allergy interfering with his ability to get a specific diet." (Id.). McDonald stated that "he is not allergic to peanuts and eggs like he initially reported" and that they "often do cause nausea but nothing else." (Id.). At the conclusion of the visit, Pierce noted that McDonald's chest pain had subsided, he was eating and drinking without difficulty, and a follow-up appointment would be scheduled. (Id.). McDonald was next seen by Pierce for complaints of chest pain on June 11, 2019. (Id. at 60). While he was being evaluated, McDonald "attempted to argue with medical staff" and claimed he was going to "tak[e] legal action regarding a diet related issue." (Id.).

On June 20, 2019, McDonald was seen by Dr. Getachew via telemedicine for a chronic care visit. (Id. at 62–64). Nurse Lori Keister was present with McDonald during the visit. (Id. at 62). McDonald again requested a kosher diet. (Id.). Keister noted that McDonald had "previously reported egg and peanut allergies, which have been

documented in his records and therefore he is receiving a medical diet not including eggs and peanuts." (<u>Id.</u> at 64). Keister also noted, however, that McDonald "has documentation where he can eat those foods and only has diarrhea." (<u>Id.</u>). As a result, Keister concluded she would "speak with [the Assistant Director of Nursing] to find out of it will be possible to change the diet." (<u>Id.</u>; Pierce Decl. ¶ 26).

Pierce avers that she is "not certain" if McDonald is "actually allergic to peanut oil or eggs," but explains that she "must take very seriously his previous statements that eating eggs and peanuts causes his throat and tongue to swell." (<u>Id.</u> ¶ 27). Pierce further states that McDonald "prefers" a Kosher diet; however, the diet is not compatible with the medical allergen diet because the kosher diet includes peanut oil and eggs. (<u>Id.</u>).

**C.   <u>Procedural History</u>**

The Court received McDonald's Complaint against Defendants Bishop and Pierce on November 20, 2019. (ECF No. 1). The Complaint alleges that Defendants violated his medical and religious rights by refusing to discontinue him from the medical allergen diet and putting him on the kosher diet. (Compl. at 4, 7). McDonald seeks declaratory relief and injunctive relief against Defendants Pierce and Bishop, as well as compensatory damages against Defendant Pierce. (<u>Id.</u> at 9).

On March 10, 2020, Pierce filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 15). The Court received McDonald's response in

opposition to Pierce's Motion on March 31, 2020. (ECF No. 19).[5] Pierce filed a Reply on April 6, 2020. (ECF No. 21).

Defendant Bishop filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment on March 19, 2020. (ECF No. 17). The Court received McDonald's response in opposition to Bishop's Motion on April 6, 2020. (ECF No. 22). To date, Bishop has not filed a Reply.

## II. DISCUSSION

### A. <u>Conversion</u>

Defendants' Motions are styled as motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No.

---

[5] Although McDonald's response is titled "Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment," the filing was docketed by the Clerk as a "Supplement to Complaint." (See ECF No. 19). The Court construes this filing as McDonald's Opposition to Pierce's Motion.

ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998)).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." <u>Nautilus Ins. Co. v. REMAC Am., Inc.</u>, 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting <u>Evans</u>, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." <u>Harrods</u>, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." <u>Id.</u> (quoting 10B Wright, Miller & Kane, <u>Federal Practice & Procedure</u> § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

Nonetheless, a Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." <u>Hamilton v. Mayor of Balt.</u>, 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." <u>Ingle ex rel. Estate of Ingle v. Yelton</u>, 439 F.3d 191, 195 (4th Cir. 2006) (quoting <u>Strag v. Bd. of Trs., Craven Cmty. Coll.</u>, 55 F.3d 943, 953 (4th Cir. 1995)).

In this case, pursuant to the dictates of <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), the Court notified McDonald of his right to respond to Defendants' Motions and advised that he may file affidavits, declarations, and exhibits along with his response. (<u>See</u> ECF Nos. 16, 18). The exhibits McDonald filed with his Oppositions were copies of documents previously filed in this case. (<u>See</u> ECF No. 19-1; ECF No. 22-1). McDonald did not submit a Rule 56(d) affidavit expressing a need for discovery. Accordingly, the

14

Court will construe Pierce's and Bishop's Motions as motions for summary judgment and will consider documents outside of McDonald's Complaint.

## B.     Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>JKC Holding Co. v. Wash. Sports Ventures, Inc.</u>, 264 F.3d 459, 465 (4th Cir. 2001) (citing <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Hooven-Lewis</u>, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

**C.**   **<u>Analysis</u>**

**1.**   **Denial of Medical Care**

McDonald alleges that Defendants forced him to be on a medical diet for food allergies that he does not have in violation of the Eighth Amendment of the United States Constitution. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976); <u>see</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976); <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016); <u>King v. Rubenstein</u>, 825 F.3d 206, 218 (4th Cir. 2016). To sustain a claim for denial of medical care under the Eighth Amendment, the

plaintiff must show that defendants' acts or omissions were done with deliberate indifference to a serious medical need. See Estelle, 429 U.S. at 106; see also Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Heyer, 849 F.3d at 210 (quoting Iko, 535 F.3d at 241); see also Scinto, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Anderson, 877 F.3d at 544. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were

inappropriate in light of that risk.'" <u>Anderson</u>, 877 F.3d at 545 (quoting <u>Parrish ex rel. Lee</u> <u>v. Cleveland</u>, 372 F.3d 294, 303 (4th Cir. 2004)); <u>see also</u> <u>Rich v. Bruce</u>, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" <u>Brice v. Va. Beach Corr. Ctr.</u>, 58 F.3d 101, 105 (4th Cir. 1995) (quoting <u>Farmer</u>, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." <u>Scinto</u>, 841 F.3d at 226 (quoting <u>Farmer</u>, 511 U.S. at 842). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." <u>Farmer</u>, 511 U.S. at 844; <u>see also</u> <u>Cox v. Quinn</u>, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable.").

McDonald asserts that his food allergy is not as severe as Defendants indicate and they have forced him to be on an allergen diet that is not medically necessary, resulting in "pain, suffering and emotional distress." (Compl. at 7). McDonald does not explain, however, how receiving meals free of eggs and peanuts has caused him pain or injury, or why discontinuing the allergen diet is necessary for treatment of any medical condition. At bottom, McDonald's dissatisfaction with his prescribed diet simply does not amount to a

serious medical condition. See Siddha v. Dovey, No. GLR-20-185, 2020 WL 6204317, at *8 (D.Md. Oct. 22, 2020) ("A serious medical condition is an illness or condition that is either life-threatening or causes an unnecessary infliction of pain when it is not treated properly.") (citations omitted).

Additionally, there is no evidence that Defendants were deliberately indifferent to McDonald's medical needs. The record in this case reveals that Defendants denied McDonald's requests to discontinue his allergy diet because McDonald himself had previously reported severe allergic reactions to eggs and peanuts and had complained when such foods appeared on his meal trays. Although McDonald's diet change requests were ultimately denied, McDonald's health care providers, including Defendant Pierce, repeatedly met with McDonald to address his concerns about his assigned diet. On several occasions, Pierce and other providers explained to McDonald why it was unsafe for him to discontinue the allergen diet. In the Court's view, Defendants' decisions here are not the result of deliberate indifference, but instead flow from Defendants' keen awareness of McDonald's self-reported life-threatening allergies to eggs and peanut oil. Moreover, McDonald's disagreement with Defendants regarding the appropriateness of a medical allergen diet cannot support a deliberate indifference claim. See Estelle, 429 U.S. 105–06 (holding that disagreements between medical staff and an inmate over the necessity for or extent of medical treatment do not rise to a constitutional injury). For these reasons, Defendants are entitled to judgment in their favor as to McDonald's Eighth Amendment claims.

2.      **Religious Freedom**

McDonald alleges that Defendants refused to provide him with a kosher diet in violation of his First Amendment right to religious freedom. It is well established that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (quoting Price v. Johnston, 334 U.S. 266, 285 (1948)). With respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. See Cruz v. Beto, 405 U.S. 319, 322 (1972) (per curiam). Prison restrictions that affect the free exercise of religion but are related to legitimate penological objectives, however, do not run afoul of the constitution. See Turner v. Safely, 482 U.S. 78, 89–91 (1987).

Courts consider the following factors in determining if the restrictions on religious exercise are related to legitimate penological objectives:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action.

Wall v. Wade, 741 F.3d 492, 499 (4th Cir. 2014) (quoting Lovelace v. Lee, 472 F.3d 174, 200 (4th Cir. 2006)). Under the Free Exercise Clause, a prisoner has a clearly established right to a diet consistent with his religious principles. Wall, 741 F.3d at 498–500.

An additional consideration in this case is the standard provided by the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),[6] which provides in part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a). RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005); see Holt v. Hobbs, 574 U.S. 352, 357–58 (2015); Smith v. Ozmint, 578 F.3d 246, 250 (4th Cir. 2009); Lovelace, 472 F.3d at 186. Enactment of RLUIPA ensured that prisoners were entitled to similar free exercise rights to those enjoyed by individuals who are not incarcerated. See Cutter, 544 U.S. at 715–17.

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); Holt, 574 U.S. at 358; Smith, 578 F.3d at 251. Under RLUIPA, the inmate must show that the challenged policy substantially burdens his exercise of his religion. See 42 U.S.C. § 2000cc-2(b); Holt, 574 U.S. at 361. A substantial burden exists where a regulation "puts

---

[6] Plaintiff is not required to plead RLUIPA for the court to determine that the statute applies to his claim. A plaintiff is "not required to use any precise or magical words in [his] pleading." King, 825 F.3d at 222 (citations omitted); see also Labram v. Havel, 43 F.3d 918, 920 (4th Cir. 1995) ("Legal labels characterizing a claim cannot, standing alone, determine whether it fails to meet [the standard for notice pleading under Federal Rule of Civil Procedure 8(a)(2)].").

substantial pressure on [the plaintiff] to modify its behavior." <u>Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.</u>, 915 F.3d 256, 260 (4th Cir. 2019) (quoting <u>Bethel World Outreach Ministries v. Montgomery Cnty. Council</u>, 706 F.3d 548, 556 (4th Cir. 2013)). A prison regulation also imposes a substantial burden when it "forces a person to choose between following the precepts of [his] religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other hand." <u>Lovelace</u>, 472 F.3d at 187 (internal quotation marks and citation omitted).

While the plaintiff in a RLUIPA action need not prove that the practice at issue is "required or essential to his [or her] religion," he must at least "demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to [his] religious practice." <u>Tillman v. Allen</u>, 187 F.Supp.3d 664, 673 (E.D.Va. 2016) (citations omitted). While RLUIPA does not define "substantial burden," courts have held that the term has the same meaning as it does in the First Amendment context. <u>Lovelace</u>, 472 F.3d at 187. "[C]ourts properly consider whether the inmate retains other means for engaging in the particular religious activity . . . in assessing whether a denial of the inmate's preferred method for engaging in that religious exercise imposes a substantial burden." <u>Tillman</u>, 187 F.Supp.3d at 674 (quoting <u>Shabazz v. Va. Dep't Corr.</u>, 3:10CV638, 2013 WL 1098102, at *7 (E.D.Va. Mar. 15, 2013)).

Here, there is no dispute that McDonald requested to switch to a kosher diet and Defendants denied those requests. Defendants do not argue that their denial of McDonald's requests for a kosher diet did not constitute a substantial burden on the practice of his religion. Instead, Defendants Pierce and Bishop argue that their actions were

constitutionally permissible because denying McDonald's request for a kosher diet was directly related to a legitimate interest in preventing him from experiencing a severe allergic reaction, going into anaphylactic shock, or even dying. Further, Pierce states there is no alternative means for McDonald to exercise this particular religious right because the kosher diet contains eggs and/or peanut oil. (Pierce Decl. ¶¶ 25–28). Ruling in favor of Defendants, therefore, would require the Court to find that Defendants' actions were justified in light of the severity of McDonald's allergy.

At this juncture, however, summary judgment is inappropriate because there is a genuine dispute of material fact as to the severity of McDonald's food allergy. Although McDonald contends that he never claimed to have a life-threatening allergy, notes in his medical record suggest that McDonald informed a health care provider in 2016 that his throat closed after eating eggs and peanuts. Additionally, McDonald repeatedly complained when he received meal trays with egg or peanut products, claiming such foods could kill him. Yet McDonald later told his medical providers that eggs and peanuts only caused diarrhea, not an allergic reaction. In light of these statements, it is apparent that McDonald's self-reporting on his food allergies has been inconsistent at best.

Defendant Pierce contends that records from McDonald's February 19, 2019 hospital visit provide proof of McDonald's food allergies because the records state that McDonald has an allergy to peanut oil and eggs. Pierce speculates that this entry "was due to [McDonald] reporting . . . at the ER" because the hospital does not have access to the patient's medical records from the prison. (Pierce Decl. ¶ 21). However, Pierce's speculation that McDonald self-reported these allergies at the hospital does not assist the

23

Court in determining whether McDonald has a food allergy and, if so, the seriousness of that allergy. Indeed, Pierce herself states she is "not certain" if McDonald is "actually allergic to peanut oil or eggs." (Id. ¶ 27).

Importantly, aside from his own self-reporting, there is no evidence in McDonald's medical record confirming a severe allergy to eggs or peanuts. There is no documentation that McDonald has ever been treated for an allergic reaction or received allergy testing to determine the severity of any food allergies. There are also no pre-incarceration medical records documenting a food allergy. At bottom, there is no medical proof that McDonald has the food allergies that Defendants cite—and indeed, there is some evidence in the record suggesting that McDonald does not have a severe reaction after consuming eggs or peanuts. First, McDonald offers an affidavit from a correctional officer showing that McDonald ate a scoop of peanut butter in front of Defendant Pierce and did not have an allergic reaction. McDonald also provides an email chain from prison officials suggesting that McDonald was permitted to switch to a kosher diet while housed at WCI. McDonald also submits documentation that he received without incident a flu shot, which contains "egg strain." (Pl.'s Mot. Submit Aff. & Med. R. at 1, ECF No. 25).

Until there is a medical determination based on more than McDonald's own self-reporting of any food allergies, there remains a substantial and key factual dispute making summary judgment inappropriate. Additionally, Defendants have not provided sufficient information that would allow the Court to determine if the refusal to authorize a kosher diet is justified under the First Amendment and RLUIPA. Thus, at this stage in the

litigation, the Court declines to enter summary judgment for Defendants on McDonald's religious exercise claims.

### 3.     Due Process

McDonald asserts that Defendants forced him to receive the medical allergen diet without his consent in violation of his due process rights guaranteed by the Fourteenth Amendment of the U.S. Constitution. (Compl. at 8). "[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." King, 825 F.3d at 222 (quoting Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 278 (1990)). "This liberty interest survives conviction and incarceration." Id. (citing Washington v. Harper, 494 U.S. 210, 221–22 (1990)). Prison officials may override this right, however, when treatment is "reasonably related to legitimate penological interests." Id. (citing Washington, 494 U.S. at 223).

Here, Defendants once again contend the denial of McDonald's request to discontinue the allergy diet was directly related to a legitimate penological interest in preventing McDonald from experiencing a severe allergic reaction. (Pierce Decl. ¶¶ 25–28). As discussed above, however, there exists a genuine dispute of material fact as to the extent and severity of McDonald's allergies to egg and peanut products. As such, the Court is not in the position to determine whether Defendants' actions were justified by a legitimate penological interest. Accordingly, the Court declines to enter summary judgment on McDonald's due process claim.

### 4.     Immunity

McDonald brings his claims against Defendant Bishop in both his individual and

official capacities. Bishop argues that the claims brought against him in his official capacity must be dismissed because he is entitled to Eleventh Amendment immunity. Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. See Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." (citations omitted)).

The Supreme Court, however, has "permit[ted] citizens to sue state officials to enjoin the enforcement of unconstitutional laws," creating "an exception to the general constitutional command that federal courts do not have jurisdiction over suits by citizens against the states." Lyle v. Griffith, 240 F. 3d 404, 412 (4th Cir. 2001) (Wilkinson, C.J., dissenting) (citing Ex parte Young, 209 U.S. 123, 154, 156 (1908)). "In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Verizon Md., Inc. v. Pub. Service Comm'n of Md., 535 U.S. 635, 645 (2002) (quoting Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997)); see also Alden v. Maine, 527 U.S. 706, 757 (1999) ("The rule, however, does not bar certain actions against state officers for injunctive or declaratory relief."); CareFirst, Inc. v. Taylor, 235 F.Supp.3d 724, 735 (D.Md. 2017) ("It clearly is proper to sue a government official in his official capacity, and it can be essential to the claim where, as here, plaintiffs assert that they are entitled to

declaratory and injunctive relief under Ex parte Young.”). In other words, Eleventh

Immunity does not bar suits seeking declaratory or prospective injunctive relief, as long as

such relief would not impose monetary liability. See Edelman v. Jordan, 415 U.S. 651, 664

(1974); see also McBurney v. Cuccinelli, 616 F.3d 393, 399 (4th Cir. 2010) (explaining

that a state officer who has a “special relation” to the injunctive relief plaintiff seeks may

be sued in his official capacity to ensure that any “federal injunction will be effective with

respect to the underlying claim”) (quoting S.C. Wildlife Fed’n v. Limehouse, 549 F.3d 324,

333 (4th Cir. 2008)).

Here, McDonald seeks only declaratory and prospective injunctive relief, not

monetary damages, against Bishop.[7] Further, Bishop is in a position to provide the

injunctive relief McDonald seeks—Bishop was formerly the Warden at NBCI in 2018 and

2019 and is now the Assistant Commissioner of the Western Region, effective February

12, 2020. (Decl. of Frank B. Bishop, Jr. [“Bishop Decl.”] ¶ 1, ECF No. 17-2). Therefore,

McDonald’s request for injunctive and declaratory relief against Bishop may proceed.

### 4.   Personal Participation

Defendant Bishop contends that he should be dismissed from this action due to a

lack of personal participation in the events that took place. The Court considers this

argument in the context of McDonald’s claims against Bishop in his individual capacity.

---

[7] For this same reason, Bishop is not entitled to qualified immunity for McDonald’s claims against him. See Rowley v. McMillan, 502 F.2d 1326, 1331 (4th Cir. 1974) (finding that qualified immunity “has no application to a suit for declaratory or injunctive relief”); see also Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 335 n.11 (4th Cir. 2009) (“Qualified immunity does not bar § 1983 actions brought against defendants in their official capacity.” (citation omitted)).

In a suit arising under 42 U.S.C. § 1983, the doctrine of respondeat superior generally does not apply and liability attaches only upon a defendant's personal participation in the constitutional violation. See Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985); see also Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

McDonald alleges in his Complaint that Bishop denied his May 10, 2019 ARP pertaining to the medical department's refusal to approve McDonald's request to discontinue the medical allergen diet. (Compl. Exs. at 25). McDonald's May 10, 2019 ARP, however, does not reference his intent to be removed from the medical allergen diet in order to be placed on the kosher diet. Instead, the ARP states McDonald's desire to be placed on the "regular diet." (Id. at 25). McDonald thus fails to provide support for his

assertion that Bishop was personally aware that McDonald was denied a kosher diet.

In his response to Bishop's motion to dismiss, McDonald states that Bishop is responsible for failing to "independently determine the veracity of Plaintiff's claims of religious and medical rights violations." (Pl.'s Opp'n to Bishop's Mot. at 2, ECF No. 22). Despite this conclusory allegation, McDonald does not put forth any facts suggesting that Bishop was personally involved in or otherwise aware of the decision to deny McDonald's request to discontinue the medical allergen diet in favor of a kosher diet. To the contrary, Bishop avers that medical services are provided to NBCI inmates by a private medical contractor; therefore, Bishop had no authority to make decisions or recommendations about medical care, order medical staff to render any treatment, or monitor the provision of medical services to inmates. (Bishop Decl. ¶¶ 2, 4). Instead, Bishop states that when an inmate complained about medical care, he "relied on the reports, assessments and judgments of the contractor's trained medical staff to prepare any response for [his] signature." (Id. ¶ 4). For these reasons, McDonald has not established Bishop's supervisory liability, and McDonald's claims against Bishop in his individual capacity must be dismissed.

## 5.      State Law and Other Claims

In a section of his Complaint labeled "Legal Claims," McDonald states violations of his rights under the Maryland Constitution, the Bill of Rights, the Declaration of Human Rights, and the American Declaration on the Rights and Duties of Man. (Compl. at 7). Other than bare reference to these sources, McDonald fails to identify how his legal rights have been violated based on these provisions. The Declaration of Human Rights and the

American Declaration on the Rights and Duties of Man do not have the force of law in the context of McDonald's Complaint. Further, McDonald's general reference to the Bill of Rights and Maryland Constitution are insufficient to identify additional claims. Accordingly, these claims will be dismissed.

### III.   CONCLUSION

For the foregoing reasons, Pierce's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 15) will be granted in part and denied in part. Defendant Bishop's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 17) will be granted in part and denied in part. A separate Order follows.

Entered this 22nd day of March, 2021.

_____/s/_____
George L. Russell, III
United States District Judge
